IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>HUGO ADALBERTO CASTILLO-MARTINEZ,<br><br>　　　　Defendant. | No. CR10-2035<br><br>REPORT AND RECOMMENDATION |

TABLE OF CONTENTS

I.  　INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. 　PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.　ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV. 　RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

V.  　DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
　　A.　Was Defendant Unlawfully Seized in Violation of the
　　　　Fourth Amendment?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
　　　　1.　Initial Encounter. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
　　　　2.　Asking Defendant to Sit. . . . . . . . . . . . . . . . . . . . . . . 9
　　　　3.　Reasonable Suspicion. . . . . . . . . . . . . . . . . . . . . . . . 10
　　B.　Was Defendant Questioned Unlawfully in Violation of the
　　　　Fifth and Sixth Amendments?. . . . . . . . . . . . . . . . . . . . . . . 11
　　　　1.　Un-Mirandized Statements. . . . . . . . . . . . . . . . . . . . 12
　　　　2.　Inevitable Discovery. . . . . . . . . . . . . . . . . . . . . . . . 14

VI. 　SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VII.　RECOMMENDATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## I. INTRODUCTION

On the 30th day of September 2010, this matter came on for hearing on the Motion to Suppress Physical Evidence and Statements (docket number 14) filed by the Defendant on September 15, 2010, as amended (docket number 18) on September 24, 2010. The Government was represented by Assistant United States Attorney Daniel C. Tvedt. Defendant Hugo Adalberto Castillo-Martinez appeared personally and was represented by his attorney, Mark C. Meyer.

## II. PROCEDURAL HISTORY

On August 17, 2010, Defendant Hugo Adalberto Castillo-Martinez was charged by Indictment with the unlawful use and possession of identity documents. It is alleged that on about January 1, 2009, Defendant knowingly used and possessed a permanent resident alien card, knowing that the document had been forged, counterfeited, or falsely made. At his arraignment on August 18, 2010, Defendant entered a plea of not guilty. Trial was scheduled for October 18, 2010.

On September 15, 2010, Defendant timely filed the instant motion to suppress. Due to the pendency of the instant motion, the trial has been rescheduled for November 29, 2010.

## III. ISSUES PRESENTED

In his motion to suppress, Defendant asserts that he was seized without reasonable suspicion on about August 10, 2010,[1] in violation of the Fourth Amendment. In his amendment to the motion, Defendant asserts that he was interrogated without being given a *Miranda* warning, in violation of his Fifth and Sixth Amendment rights.

## IV. RELEVANT FACTS

In the morning of August 9, 2010, Special Agents Michael Fischels and Andrew Lund of Immigration and Customs Enforcement ("ICE") traveled from the ICE office in Cedar Rapids to Waterloo, Iowa, to assist Black Hawk County deputies in attempting to

---

[1] It is apparently undisputed that the actual date of the encounter was August 9, 2010, as reflected by Defendant's brief filed in support of his motion.

2

locate a fugitive. According to Fischels, the Black Hawk County Sheriff had an arrest warrant for the individual on local charges. In addition, however, the person had been previously deported, thereby calling for administrative enforcement by ICE.

The ICE special agents accompanied sheriff's deputies to an apartment complex on Doreen Avenue in Waterloo. The officers entered a common hallway located on the first floor. While the record is somewhat imprecise, Special Agent Lund and the sheriff's deputies apparently gained access to an apartment located on the first floor. Special Agent Fischels remained in the hallway.

While standing in the hallway, Special Agent Fischels began talking to two persons who lived in the apartment across the hallway from where Special Agent Lund was located. Fischels asked the individuals if they knew anything about the fugitive the officers were seeking. As Fischels was talking to the two neighbors, he saw Defendant and two other persons in a nearby open stairwell.

After seeing Defendant, Special Agent Fischels stopped talking to the two neighbors and "motioned for him to come my way." The extent to which Defendant moved toward Fischels is unclear to the Court. Fischels testified that Defendant "remained standing on the stairwell while I was on the ground floor." Fischels immediately identified himself, telling Defendant that he was with the police and was also a special agent with ICE. Fischels was wearing "plain clothes," but his badge and firearm were visible on his right hip.

After identifying himself, Special Agent Fischels asked Defendant and the two persons with him whether they recognized the fugitive's name. Fischels also showed Defendant and the others a photograph of the fugitive and asked if they recognized him. Defendant and the others denied knowing anything about the fugitive. When speaking to the neighbors, Fischels was communicating in Spanish, and he also spoke with Defendant and the others in Spanish. According to Fischels, Defendant was "very cooperative" and "calm" and appeared to understand what Fischels was saying.

Special Agent Fischels then asked Defendant for "any documents of identification." Defendant told Fischels that he did not have any identification on him, but that he had a visa and a passport. Because Defendant said he had a visa, Fischels asked him where he was from. Defendant said he was from Guatemala. Fischels then asked Defendant to sit in the hallway while he spoke to the other two persons. Fischels testified that his request is translated in Spanish as "are you able to take a seat for me over here." Defendant complied.

Approximately five minutes later, Special Agent Lund came out of the apartment into the hallway. Lund was also wearing plain clothes, with a badge and firearm on his belt. Special Agent Fischels told Lund to question Defendant regarding his visa. Lund spoke to Defendant in English, which he appeared to understand.

In response to questioning, Defendant told Special Agent Lund that his visa and passport were in his vehicle, which was parked outside. Lund asked Defendant if they could go to the vehicle and retrieve the documents. Defendant agreed. Upon reaching the vehicle, Defendant opened the door, but Lund asked that he be permitted to retrieve the documents from the vehicle, for officer safety. Defendant agreed. After retrieving the documents, Lund and Defendant went back inside to the first floor hallway.

An examination of the documents reflected Defendant in possession of an H2B visa, which permits a non-citizen to work for a specified employer and for a specified length of time. Upon examining the documents, Special Agent Lund noticed that the visa had expired on July 15, 2008, more than two years earlier. When asked, Defendant acknowledged that the visa had expired. Lund then asked Defendant whether he still worked for the same employer – Eller and Sons Trees, Inc.[2] Defendant responded that he no longer worked for that employer, but was instead employed at Los Amigos restaurant in Cedar Falls, Iowa. Lund then asked Defendant to sit back down in the hallway, and he complied.

---

[2] Lund testified that authorities learned "well after the fact" that the employer is located in Georgia.

The ICE agents then decided to administratively arrest Defendant for overstaying his H2B visa. Defendant was placed in handcuffs and transported to the Black Hawk County Sheriff's Office by deputies. Special Agents Fischels and Lund then went to the Los Amigos restaurant in Cedar Falls. The agents advised the manager that Defendant had been arrested, and asked for a copy of Defendant's I-9 (authorization for employment form). The manager said the documents were kept by his accountant in Cedar Rapids. The agents were later notified that the restaurant did not have an I-9 form for Defendant, but the restaurant provided other documentation used by Defendant to obtain employment. That documentation included a form I-551 permanent resident card ("green card") which had not been assigned to Defendant and was, apparently, counterfeit.

After visiting the Los Amigos restaurant, the agents returned to the Black Hawk County Sheriff's Office and then transported Defendant to the ICE office in Cedar Rapids. After arriving in Cedar Rapids, Defendant was questioned further as part of an "administrative processing." Among other things, Defendant confirmed that he worked at Los Amigos. When given an opportunity to make a phone call, Defendant called the manager at his employment. Defendant was not given a *Miranda* warning at any time.

## V. DISCUSSION

Defendant asserts that "a seizure occurred" when Special Agent Fischels "conveyed to him a message that he was required to comply with their request that he provide identification." The Government denies that Defendant was "seized," but also argues that the agent's actions were supported by reasonable suspicion. In the amendment to his motion to suppress, Defendant asserts that he was subjected to a custodial interrogation, without being given a *Miranda* warning. The Government responds that Defendant's statements were made "spontaneously" during the administrative processing, and not in response to a custodial interrogation. In addition, the Government asserts that information regarding Defendant's employment – and use of a counterfeit resident alien card – would have been "inevitably discovered."

## A. Was Defendant Unlawfully Seized in Violation of the Fourth Amendment?

### 1. Initial Encounter

The United States Constitution protects persons "against unreasonable searches and seizures." U.S. CONST. amend. IV. However, not all contacts between a law enforcement officer and an individual implicate the Fourth Amendment. The Court's "first task" is to determine "at what point in this encounter the Fourth Amendment becomes relevant." *Terry v. Ohio*, 392 U.S. 1, 16 (1968).

A law enforcement officer is free to approach an individual in public and ask questions. *United States v. Drayton*, 536 U.S. 194, 200 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."). The contact remains consensual, and no "seizure" occurs, if the person voluntarily stops and responds to the officer's questions. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required.") (internal citation omitted).

Here, Special Agent Fischels approached Defendant in the hallway and asked questions regarding Defendant's possible knowledge of the fugitive whom the officers were seeking. At that point, Defendant was free to ignore Fischels and walk away. After asking Defendant questions regarding the fugitive being sought, Fischels then asked Defendant for "any documents of identification." Asking to examine an individual's identification is not violative of the Fourth Amendment, providing the officer does not suggest that compliance is required.

> We have stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; **ask to examine the individual's identification**; and request consent to search his or her luggage – as long as the police do not convey a message that compliance with their requests is required.

*Bostick*, 501 U.S. at 434-35 (internal citations omitted) (emphasis added). "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 216 (1984).

Special Agent Fischels was the only law enforcement officer in the hallway. Defendant was accompanied by two other persons, and two "neighbors" were also in the hallway at that time. There is no evidence that Fischels approached Defendant in a threatening manner, or that he raised his voice when asking Defendant questions. As in *Drayton*, "there was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." *Drayton*, 536 U.S. at 204. While Fischels' firearm was visible to Defendant, "[t]hat most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." *Id.* at 205.

The Court believes that the Eighth Circuit's opinion in *United States v. Flores-Sandoval*, 474 F.3d 1142 (8th Cir. 2007), is instructive in this case. There, the defendant was released from jail after an initial indictment for illegal reentry into the United States was dismissed. The Eighth Circuit's opinion described what happened next:

> As Flores-Sandoval walked out of jail, ICE agent Tracy Warner approached him on the sidewalk outside the jail. Warner identified himself as an ICE agent and asked Flores-Sandoval's name, which he provided. Warner then asked where he was born and he replied Mexico. Questioned about his immigration status, Flores-Sandoval stated that he had sent his documents home, had no identification, and did not have a social security number. When asked why he did not have a social security number or immigration documents, Flores-Sandoval admitted that he was in the country illegally.

*Id.* at 1144.

Flores-Sandoval argued that the sidewalk encounter violated the Fourth and Fifth Amendments. Flores-Sandoval maintained that the ICE agent "did not have reasonable suspicion to stop and question him and that his 'un *Mirandized* statements' are not admissible." *Id.* The Eighth Circuit Court of Appeals concluded, however, that the defendant's "liberty was not restrained in such a way that a reasonable person would have felt compelled to stay. Because the encounter was consensual, the Fourth Amendment was not implicated, and reasonable suspicion was not required." *Id.* at 1146.

In rejecting Flores-Sandoval's argument, the Court stated:

> A consensual encounter becomes a seizure implicating the Fourth Amendment when, considering the totality of the circumstances, the questioning is "so intimidating, threatening, or coercive that a reasonable person would not have believed himself free to leave."
>
> . . .
>
> Factors indicating a seizure are: the presence of several officers, a display of a weapon by an officer, physical touching of the person, or the "use of language or tone of voice indicating that compliance with the officer's request might be compelled." (citations omitted) A seizure occurs when the officer, "by means of physical force or show of authority, has in some way restrained the liberty" of a suspect.

*Id.* at 1145.

In the instant action, Special Agent Fischels was the only law enforcement officer in the hallway, together with Defendant and four other persons. Fischels did not brandish his weapon, physically touch Defendant, or use language or a tone of voice which would suggest compliance was required. There is no evidence that Fischels was intimidating or threatening in his actions. Fischels described Defendant as calm and cooperative, and there is no suggestion that Defendant ever resisted the request to identify himself or answer questions.

The Court concludes that the initial encounter between Special Agent Fischels and Defendant was consensual, did not constitute a "seizure," and did not trigger Fourth

8

Amendment protection. *Bostick*, 501 U.S. at 434 ("Since *Terry*, we have held repeatedly that mere police questioning does not constitute a seizure."). *See also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitute require some particularized and objective justification.").

### 2. *Asking Defendant to Sit*

In his brief, Defendant asserts only that a seizure occurred when the ICE agents "conveyed to him a message that he was required to comply with their request that he provide identification." As set forth above, the Court concludes that merely asking an individual for identification does not constitute a seizure. In his two-page brief, Defendant does not assert that he was seized by any other actions taken by the ICE agents, until his formal arrest. Nonetheless, the Court will review the remainder of the encounter at the apartment building in Waterloo to determine if Defendant was "seized."

After learning that Defendant was from Guatemala, but did not have any identification or his visa on his person, Special Agent Fischels asked him to sit in the hallway "so that I could address the other individuals who were standing in the hallway while he waited and another immigration officer would talk to him." A short time later, Special Agent Lund entered the hallway and was instructed by Fischels to question Defendant regarding his visa. After learning that Defendant's visa and passport were in his car outside the apartment building, Defendant agreed to accompany Lund in retrieving the documents. A review of the documents revealed that Defendant had overstayed his H2B visa.

Immigration officers are authorized by statute "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." *See* 8 U.S.C. § 1357(a)(1). After learning that Defendant was an alien, but did not have identification documents on his person, the ICE agents were justified in investigating further. *See United States v. Rajah*, 544 F.3d 427, 440 (2d Cir. 2008).

Special Agent Fischels denied that Defendant was "detained" when he was asked to sit in the hallway to await further questioning, but acknowledged that "if he would have attempted to leave, I would have questioned him further as to why he was leaving, and further expand upon his possession or lack of possession of his visa." Similarly, Special Agent Lund testified that after Defendant revealed that he was from Guatemala, but did not have documentation on his person, "he was not free to go." Defendant was not advised that he was not free to leave, however, until he was formally arrested. There was no showing of force or intimidation, no threats or physical touching, and Defendant's liberty was not restrained in any way. The Court concludes that no seizure occurred when Defendant agreed to Fischels' request that he sit in the hallway until he could be questioned further.

### 3. *Reasonable Suspicion*

As set forth above, the Court does not believe that Defendant was seized prior to his administrative arrest by ICE agents for overstaying his H2B visa. Accordingly, I do not believe it is necessary to determine whether the agents had "reasonable suspicion" to justify their actions. In the event the district court disagrees with my analysis on the seizure issue, however, the Court will also address the issue of reasonable suspicion.

To justify a *Terry*-type stop, an officer must have a reasonable, articulable suspicion that criminal activity is afoot. *Terry*, 392 U.S. at 30. The Supreme Court has recognized, however, that "the concept of reasonable suspicion is somewhat abstract." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). "Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are commonsense, non-technical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). The reasonable suspicion standard is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," but requires "at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*,

528 U.S. 119, 123 (2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Id.* at 123-24.

Turning to the facts in the instant action, clearly no seizure occurred when Special Agent Fischels approached Defendant in a public place and asked him questions, including asking for Defendant's identification. *Bostick*, 501 U.S. at 434-35. In response to those initial questions, Defendant told Fischels that he was in the United States from Guatemala on a visa, but did not have any identification documents on him. At that point, Fischels had a reasonable, articulable suspicion that Defendant was in violation of immigration laws, requiring that he carry with him evidence of his alien registration status. *See* 8 U.S.C. § 1304(e). In asking Defendant to sit in the hallway pending further questioning, Fischels was acting on more than an "inchoate suspicion" or hunch. The intrusion on Defendant was minimal. Special Agent Lund questioned Defendant shortly after that time and confirmed from a review of the documents that Defendant had overstayed his H2B visa. Accordingly, even if reasonable suspicion was required in order to ask Defendant to sit in the hall while waiting for another ICE agent, the Court concludes that standard was met here.

### B. Was Defendant Questioned Unlawfully in Violation of the Fifth and Sixth Amendments?

In the amendment to his motion to suppress, Defendant asserts that he was questioned without being given a *Miranda* warning and, therefore, "requests that all statements made about his employer, and the fruits of those statements, be suppressed." While the amendment provides scant argument on the issue, Defendant apparently objects both to the questioning in the hallway at the apartment building in Waterloo and the questioning which occurred after being taken to the ICE office in Cedar Rapids. The Government argues that no *Miranda* warning was required, and that information regarding Defendant's employment and use of a false document would have inevitably been discovered through an independent source.

*1.  Un-Mirandized Statements*

In his amendment to the motion to suppress, Defendant asserts that the agents' failure to give him a *Miranda* warning violated his Fifth and Sixth Amendment rights. Preliminarily, the Court notes that the Sixth Amendment right to counsel "does not attach until a prosecution is commenced." *Rothgery v. Gillespie County, Tex.*, 554 U.S. 191, 128 S. Ct. 2578, 2584 (2008) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). *See also United States v. Morriss*, 531 F.3d 591, 592 (8th Cir. 2008) (concluding that the Sixth Amendment right to counsel had not attached when the defendant was interviewed by an FBI agent).

Regarding Defendant's Fifth Amendment right against self-incrimination, the *Miranda* warning applies only to custodial interrogations. A custodial interrogation involves "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "*Miranda* warnings are not required for 'general on-the-scene questioning as to facts surrounding a crime,' which does not present 'the compelling atmosphere inherent in the process of in-custody interrogation.'" *United States v. Howard*, 532 F.3d 755, 761 (8th Cir. 2008) (quoting *Miranda*, 384 U.S. at 477-78).

As set forth above, the Court has concluded that the interaction between the ICE agents and Defendant at the apartment in Waterloo was consensual. Obviously, it follows that no *Miranda* warning was required at that time. Even *if* the Court concluded that Defendant was seized when he agreed to sit in the hallway at Special Agent Fischels' request, "most *Terry* stops do not trigger the detainee's *Miranda* rights." *United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003). It is only where a person's freedom "has been so restricted as to render him 'in custody'," that a *Miranda* warning is required. *United States v. Martinez*, 462 F.3d 903, 908 (8th Cir. 2006). The Court concludes that no *Miranda* warning was required prior to the agents' questioning of Defendant at the apartment building in Waterloo.

12

It is undisputed, however, that Defendant was eventually arrested and transported first to the Black Hawk County Sheriff's Office and then to the ICE office in Cedar Rapids. Upon his arrival at the ICE office, Defendant was "administratively processed." Special Agent Lund testified that administrative processing includes asking the defendant biographical data, including his name, his parents' names, and the address of any foreign residence. The defendant is also fingerprinted and a check is conducted of his criminal history to see if he has any outstanding "wants and warrants." According to Lund, "one of the standard questions for immigration processing is their place of employment." Defendant was asked that question here and "reiterated that he worked for Los Amigos restaurant," including the wage he earned and how long he had worked there.

"It is well-settled that routine biographical data is exempted from *Miranda*'s coverage." *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996) (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990)). "Only if the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, will the questioning be subject to scrutiny." *United States v. McLaughlin*, 777 F.2d 388, 391-92 (8th Cir. 1985). In *McLaughlin*, the defendant was arrested on drug charges. A pretrial services officer asked McLaughlin his place of employment and home address to determine whether he should be detained or released pending trial. The Court concluded that the requested information "had no relevance to the offenses of which McLaughlin was charged," the officer "could not have expected the inquiry to elicit an incriminating response," and, therefore, "the questioning did not for *Miranda* purposes constitute interrogation." *Id.* at 392.

In the instant action, however, it was expected that Defendant would be administratively processed for removal based on his overstaying an H2B visa. As explained by Special Agent Lund at the time of hearing, an H2B visa authorizes a nonresident to work for a particular employer and for a specified length of time. Accordingly, questions regarding Defendant's current employment were directly relevant

to the reason for which he had been arrested, and the agent could reasonably expect that his answer may be incriminating. The Court concludes that questioning the Defendant following his arrest regarding his employment, without first advising him of his *Miranda* rights, was violative of the Fifth Amendment. Therefore, Defendant's statement at the ICE office that he was employed at Los Amigos must be suppressed.[3]

### 2. *Inevitable Discovery*

In his amendment to the motion to suppress, Defendant not only asks that statements made by him regarding his employer be suppressed, he also asks that "the fruits of those statements" be suppressed. While Defendant's two-page amendment is not specific, the Court assumes that he is referring to the counterfeit form I-551 permanent resident card which was provided to the ICE agents by the Los Amigos restaurant. The Government asserts that even if Defendant's statement regarding his employment at the ICE office is suppressed, the agents would have inevitably discovered Defendant's use of a false document from independent sources.[4]

In *Nix v. Williams*, 467 U.S. 431 (1984), the Court adopted the inevitable discovery doctrine, which it described as "closely related" to the independent source doctrine. Both doctrines constitute exceptions to the exclusionary rule generally associated with police misconduct. Under either doctrine, evidence is not excluded if it "would put the police in a worse position than they would have been in absent any error or violation." *Id.* at 443. Exclusion of evidence that would have been inevitably discovered would "put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place." *Id.* at 444.

---

[3] The Court notes parenthetically, however, that Defendant had previously provided the ICE agents with the same information in response to questioning at the apartment building in Waterloo. For the reasons set forth above, any statements made by Defendant at that time are admissible.

[4] Defendant did not file a reply brief or otherwise respond to the Government's argument regarding inevitable discovery.

> If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense.

*Id.*

To prevail under the inevitable discovery exception to the exclusionary rule, the government must establish "(1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)).

The Court finds that the Government has met its burden of proof. In this case, the ICE agents had discovered Defendant's place of employment, and in fact had already visited the Los Amigos restaurant, prior to Defendant being questioned in custody in Cedar Rapids. During the initial questioning of Defendant at the apartment building in Waterloo – when he was not in custody and no *Miranda* warning was required – Defendant told Special Agent Lund that he was employed at Los Amigos. The agents went directly to the restaurant and asked the manager to produce a copy of Defendant's I-9 authorization for employment form. In response to that request, the restaurant's attorney later provided the fraudulent I-551 permanent resident card used by Defendant.

Furthermore, when Defendant was afforded an opportunity to make a phone call while in custody at the ICE office in Cedar Rapids, he called his manager at the Los Amigos restaurant. According to Special Agent Lund, the procedure followed by ICE is to have the subject provide the officer with the phone number and name of the person whom they are calling, "to verify that they did indeed make a phone call to somebody." In this case, Defendant gave the agents the name of Oscar Valdivia, who Defendant identified as the manager at his job.

Even if Defendant had not provided any information regarding his employment, the fraudulent document would still have been discovered. Special Agent Lund testified that when someone is arrested for administrative processing, authorities check with Iowa Workforce Development for any immigration-related violations with their work. That was done in this case, and the records reflected that Defendant was employed at Los Amigos restaurant. That is, even if Defendant had not disclosed his place of employment, the information would have been obtained by the ICE agents pursuant to their routine procedures. Accordingly, Defendant's use of a fraudulent document to obtain employment would have inevitably been discovered.

## VI. SUMMARY

In summary, I believe that Defendant was not "seized" during his encounter with ICE agents at an apartment building in Waterloo, until he was formally arrested. Even *if* the Court concludes that Defendant was seized when he agreed to sit in the hallway at the agent's request, the seizure was the product of a reasonable suspicion held by the agent that Defendant was violating an immigration law.

Defendant was not in custody while being questioned by the agents at the apartment building in Waterloo, and no *Miranda* warning was required. Under the circumstances of this case, however, the agent's questioning of Defendant at the ICE office in Cedar Rapids regarding his employment could reasonably have been expected to be incriminating and, therefore, should be suppressed. The allegedly fraudulent resident alien card was obtained by the agents independent of Defendant's statements at the ICE office, however, and therefore should not be suppressed.

In short, I believe that Defendant's statements at the apartment building in Waterloo and the documents obtained from the Los Amigos restaurant are admissible. Defendant's motion to suppress in that regard should be denied. However, Defendant's statement regarding his place of employment in response to questioning at the ICE office in Cedar Rapids should be suppressed as a violation of his *Miranda* rights. To that limited extent, Defendant's motion to suppress should be granted.

## VII. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that Defendant's Motion to Suppress (docket number 14), as amended (docket number 18), be **GRANTED** in part and **DENIED** in part, as set forth above.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on September 30, 2010.*

DATED this 8th day of October, 2010.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA